UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTTIE D. HOGROE, | |
| Plaintiff, | No. 16 C 2976 |
| v. | Judge Thomas M. Durkin |
| BURLINGTON NORTHERN SANTA FE RAILWAY CO., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Scottie Hogroe was fired from his job as a train engineer by the Burlington Northern Santa Fe Railway Company. He alleges that BNSF fired him because he is African-American in violation of 42 U.S.C. § 1981. BNSF has moved for summary judgment. R. 65. That motion is granted for the following reasons.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue

for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Background**

One of BNSF's customers is International-Matex Tank Terminals, a bulk liquid storage facility. BNSF services IMTT by "switching out" (which the Court understands to mean deliver and/or retrieve) tank railcars. R. 82 ¶¶ 10-11.

Some of the liquids IMTT stores are hazardous and flammable. *Id.* ¶ 11. Presumably for this reason, IMTT is a secured facility under the protection of the U.S. Department of Homeland Security. *Id.* ¶ 12. In order to enter IMTT, BNSF employees are provided special identification cards. *Id.* In order to switch out tank railcars from IMTT, BNSF drives a train engine to IMTT and stops short of the locked security gate. The IMTT security guard checks the BNSF crew's identification cards and then unlocks the gate so they can drive the engine into the IMTT facility. *Id.* ¶¶ 12-13. Hogroe was familiar with IMTT and the procedures for entering. *Id.* ¶ 15.

On January 13, 2013, Hogroe, conductor Reuben Owens, and helper LeCurtis Williams, were the crew of a train assigned to deliver two tank railcars filled with more than 3,000 gallons of diesel fuel to IMTT. *Id.* ¶¶ 10, 16. Hogroe was driving two engines pushing the two tankers and a caboose. *Id.* ¶ 16. Since the engines were pushing the train, rather than pulling it, the Court understands that the caboose was at the front of the train. Owens and Williams were riding on the outside platform of

the caboose, and Owens was responsible for telling Hogroe when to stop by radio. *Id.* ¶ 16.

According to BNSF rules, when using an engine to push a train of cars, the engineer must stop the train within half the distance specified in the last radio communication from the conductor. *Id.* ¶ 18. For instance, if the conductor instructs the engineer to move the train ten car lengths and then the engineer hears no further communication, the engineer must stop the train after five car lengths. *Id.*

Hogroe admits that based on the last instruction he heard from Owens he should have stopped the train one and one-half car lengths from the IMTT security gate. *Id.* ¶ 24. Hogroe also admits that he did not hear further instructions from Owens, yet he continued to drive the train such that it crashed through the IMTT security gate. *Id.* ¶¶ 24-25. Hogroe testified that Owens and Williams jumped off the train and threw rocks at the engine windows in order to get Hogroe's attention so that he would stop the train. *Id.* ¶ 24. Hogroe also testified that the IMTT security guard was not in danger because the guard "is up on a platform," not on the ground. R. 81-1 at 11 (35:19-22). But Hogroe failed to contest BNSF's assertion that the security guard was on the ground at the time of the incident ready to unlock the gate and was not in the train's path only because the security guard had "forgotten a pen and turned around to retrieve it." R. 82 ¶ 28 (citing R. 72 at 20). The only damage caused was to the gate's lock.

Hogroe's employment is governed by a collective bargaining agreement. Under the CBA, employees must comply with a code of operating rules. The CBA also

3

provides for a progressive discipline policy which evaluates and categorizes infractions and corresponding discipline according to seriousness: "standard," "serious" and "stand alone." *See* R. 81-6.[1] Multiple "serious" infractions "committed

---

[1] The discipline policy provides the following "non-exhaustive list of Serious Violations":

> (1) Violation of any work procedure that is designed to protect employees, the public and/or others from potentially serious injury(ies) and fatality(ies). . . .
> (2) Operating rule violation for which FRA decertification is also mandated . . . .
> (3) First violation of Rule 1.5 . . . .
> (4) Unauthorized absence
> (5) Tampering with safety devices
> (6) EEO policy infractions
> (7) Failure to timely report a DWI conviction . . . .
> (8) Late reporting of accident or injury . . . .

R. 81-6 at 6.

The disciplines policy also provides the following "non-exhaustive list" of "Stand Alone Dismissible Violations":

> (1) Theft or any other fraudulent act . . . .
> (2) Dishonesty about any job-related subject, including, but not limited to, falsification or misrepresentation of an injury . . . .
> (3) Conduct leading to a felony conviction. . . .
> (4) Refusal to submit at any to required testing for drug or alcohol use . . . .
> (5) Violence in the workplace . . . .
> (6) Conscious or reckless indifference to the safety of themselves, other or the public; indifference to duty; intentional destruction of company property; malicious rule violation; insubordination
> (7) Rule violation that could result in serious collision and/or derailment, serious injury to another employee or the general public, fatality, or extensive damage to company or public property
> (8) Extended unauthorized absence

within the applicable review period may result in dismissal," *see id.* at 5, whereas a single "stand alone" violation is sufficient to warrant "immediate dismissal," *id.*

An investigation found that Hogroe's actions demonstrated a "reckless" disregard for safety, which could have resulted in injury or fatality, and qualified as a stand alone violation permitting dismissal. Hogroe appealed his dismissal to BNSF management, BNSF labor relations, and finally to the Public Law Board—a third-party arbitration panel created by federal statute to hear such appeals for railroad employees. Hogroe's dismissal was affirmed on all three appeals.

**Analysis**

Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" *Id.* § 1981(a). In order to succeed in a Section 1981 lawsuit in the employment context, "a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013); *see also Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (stating that Section 1981

---

(9) Aggravated EEO policy infractions
(10) Failure to report accident or injury
(11) Multiple Serious violations committed during the same tour of duty

R. 81-6 at 7.

5

plaintiffs must plead that: "(1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)").

"The legal analysis for discrimination claims under Title VII and § 1981 is identical[.]" *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015); *see also Pearson v. Advocate Health Care*, 727 Fed. App'x 866, 868 (7th Cir. 2018) ("the standards . . . are the same under 42 U.S.C. § 1981 and Title VII"). "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present 'evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused' the adverse employment action." *Barbera v. Pearson Edu., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "With such a claim, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Barbera*, 906 F.3d at 628.

The *McDonnell Douglas* burden-shifting framework is one way a plaintiff can meet his burden. *See id.* at 629 ("[W]e left *McDonnell Douglas* burden-shifting as a viable option for pursuing employment discrimination claims."). Under this framework, a plaintiff first must show: "(1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment." *Id.* If the plaintiff makes "this *prima facie*

6

showing, then the burden would shift to [the defendant] to present a legitimate, non-discriminatory reason for the challenged employment action." *Id.* If the defendant carries this burden, then the burden shifts back to the plaintiff "to show pretext, or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment." *Id.*

Hogroe attempts to satisfy his burden by identifying seven BNSF employees who are Caucasian, and who he claims committed infractions as serious as his but were not categorized as such under the discipline policy, and so were not fired:

- Steven Hesse did not stop the train he was driving in a storage facility after losing communication with his conductor. The conductor had directed the train on to the wrong track. The train struck a door of the storage facility. *See* R. 81-8. Pursuant to an agreement between BNSF and the union creating a disciplinary process known as "alternative handling," Hesse waived investigation and accepted responsibility so that he received a letter noting his violation but avoided having the violation appear on his employee "transcript." *See* R. 87 ¶¶ 8-9.

- In 2005, Jody Dolan committed a "serious" violation when he tested positive for alcohol. R. 87 ¶ 32. In 2015, Dolan received a "serious" violation for driving a train through a stop signal in the train yard, *see id.*, and another "serious" violation for not operating a BNSF automobile in a safe fashion, *see id.*

- On two different occasions, Scott Hawk drove trains through stop signals in train yards. *See* R. 81-10 at 6-8. Both were "serious" violations.

7

- Sandra Niemi received a "serious" violation for driving a train through a stop signal in a train yard, *see* R. 81-11 at 6, and received two "standard" violations for stopping trains too late (without hitting any thing or person) and for failing to operate a motor vehicle properly on railroad property, *see* R. 81-11 at 14-18; R. 87 ¶¶ 35-36.

- James DeEmo received a "serious" violation for driving a train through a stop signal in a train yard, and later received a "standard" violation for stopping a train too late in a train yard (without hitting any thing or person). R. 81-12 at 5-6; R. 87 ¶ 37.

- Keith Huff was given a "standard" violation for driving a train that struck the door of a truck, which opened unexpectedly. *See* R. 87 ¶ 38; R. 66-9 ¶ 28(1).

- Casey Robertson received a "serious" violation for driving a train too fast and crashing it into an engine in a train yard. R. 87 ¶ 39.

Hogroe does not contend that any of these incidents put any people in immediate physical danger.

"An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them." *Barbera*, 906 F.3d at 629. "Similarly situated employees must be directly comparable to the plaintiff in all material respects, yet this is a flexible inquiry with no magic formula." *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018). "The similarly-situated inquiry is flexible,

common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018). In a case involving disparate discipline, to determine "whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012). "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Barbera*, 906 F.3d at 629.

### A.  Supervisors

It is Hogroe's burden to show that he shared a supervisor with the comparators he has identified. Hogroe contends that "Merriweather or McMahan, and Smith and Jenkins were involved in each disciplinary decision at issue" for the comparators. R. 87 ¶ 40. But the deposition testimony Hogroe cites in support of this statement merely describes BNSF's general discipline decision-making hierarchy and does not specifically identify the decision-makers for the seven comparators. *See id.* (citing R. 81-2 at 8; R. 81-3 at 8, 11-12). Hogroe has not met his burden here.

However, the Court notes that BNSF's contentions about the authority to terminate employees leaves open the possibility that Hogroe and the comparators share a decision-maker. It is undisputed that Randy McMahan supervised the Joliet yard where Hogroe worked. R. 87 ¶ 2. It is also undisputed that McMahan was the supervisor for only one of the seven comparators. *Id.* ¶ 3. Yet, in its statement of facts,

9

BNSF concedes that BNSF's General Manager, as opposed to a yard supervisor like McMahan, "is the ultimate decision-maker in termination decisions." R. 82 ¶ 31. It is also undisputed that General Manager Jeff Jenkins approved McMahan's recommendation to fire Hogore. R. 82 ¶ 37. The parties' papers do not appear to address whether Jenkins approved the discipline rendered to the seven comparators.

Hogroe's failure to satisfy his burden on this issue is sufficient to grant summary judgment in BNSF's favor. But considering the uncertainty of the evidence on this issue, the Court will address whether the comparators' conduct is sufficiently similar to Hogroe's.

**B. Conduct**

In his response to BNSF's statement of material facts, Hogroe disputes that his conduct constituted a "stand alone" violation. *See, e.g.*, R. 82 ¶ 36. And in his brief, he argues that some of the seven comparators should have been fired for committing "multiple serious level violations." R. 80 at 15. But these arguments are made in single sentences without analyzing the application of the terms of the discipline policy and its definitions of "serious" and "stand alone." Thus, Hogroe has waived any argument that his conduct did not constitute a "stand alone" violation, or that the seven comparators should have been fired for committing multiple "serious" violations.

The more fulsome argument Hogroe makes is that his conduct was no worse than the seven comparators he has identified. Hogroe argues summary judgment should be denied because he has identified four "Caucasian employees [who] caused

damage to company property due to safety violations without being terminated." R. 80 at 15. Hogroe contends that the property damage he caused (damaged a gate lock) is not as great as that caused by Hesse (damaged a facility door), Huff (a damaged a truck door), and Robertson (damaged another train engine). Hogroe's focus on property damage is misplaced. This focus myopically ignores the extent to which each employee endangered the physical safety of other people. Hogroe does not contend that Hesse, Huff, or Robertson placed other workers in any immediate physical danger, whereas he admits that his crew members were forced to jump off a moving train and does not deny that the facility security guard was on the ground to unlock the gate. Furthermore, Hogroe's focus on property damage is an implicit concession that the four comparators whose moving infractions (e.g., driving through a stop signal) did not cause property damage are not similar to Hogroe. These differences are all the more apparent considering the fact that, unlike any of the other comparators, Hogroe was driving a train containing hazardous materials into a facility storing hazardous materials. The risk that hazardous material might explode or contaminate land and water is an additional material difference between Hogroe's conduct and that of the seven comparators he has identified. (Hogroe does not contend that any of the comparators were driving trains hauling anything, let alone hazardous materials.)

Hogroe cites *Morris v. BNSF Railway Company*, in which Judge Kennelly denied BNSF's summary judgment motion holding that comparators who were not hauling hazardous materials when they committed infractions could be similarly

11

situated to the plaintiff who was hauling hazardous materials. 2018 WL 4742105, at *4 (N.D. Ill. Oct. 2, 2018). But in *Morris*, the plaintiff and the comparators were all charged with the same level of offense—multiple "serious" violations in one train run—and the African-American plaintiff was fired but the Caucasian comparators were not. Thus, the issue in *Morris* was whether BNSF had discriminated in rendering punishment for infractions it deemed to be equivalent under the discipline policy.

By contrast, Hogroe was charged with a more serious infraction than the Caucasian comparators. None of the comparators was charged with a "stand alone" violation like Hogroe. As discussed, Hogroe has cited no evidence or made any argument that the difference in charges was inappropriate under the discipline policy. Indeed, Hogroe was likely charged more seriously because of the greater danger posed by his conduct. Accordingly, he was charged with a "stand alone" violation because he acted with reckless indifference to safety that could have caused serious injury or fatality. Hogroe does not make any meaningful argument to the contrary; for instance, he does not contend that his conduct was not as dangerous as the evidence makes it seem. Thus, no reasonable jury could find that he was fired for any other reason than that he failed to stop a train carrying 3,000 gallons of diesel fuel into a facility storing hazardous materials, while three people were in or near the train's path, putting them at risk of serious injury or death.

**Conclusion**

For the foregoing reasons, BNSF's motion for summary judgment, R. 65, is granted.

ENTERED:

*Thomas M Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: December 20, 2018